IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHN H. PRICE,

      Plaintiff,

v.

FACILITY MANAGEMENT GROUP,
INC.,

      Defendant.

CIVIL ACTION NO.

1:03-CV-3039-JEC

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV 3 0 2005

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

**O R D E R**

This case is presently before the Court on defendant's Motion
for Summary Judgment [69].  The Court has reviewed the record and the
arguments of the parties and, for the reasons set out below,
concludes that defendant's Motion for Summary Judgment [69] should be
**GRANTED**.

**BACKGROUND**

Defendant Facility Management Group, Inc. is a corporation that
performs architecture, engineering and construction management
services for private and public sector entities.  (Def.'s Statement
of Material Facts ("DSMF") [71] at ¶ 1.)[1]  Plaintiff began working for

---

[1]   Unless otherwise indicated, the Court draws the undisputed
facts from defendant's Statement of Material Facts ("DSMF") [71].
Plaintiff has not filed a statement of facts and has failed to

defendant as Senior Manager, Head of Mechanical Engineering, on June 18, 2001.  (*Id.* at ¶ 2.)[2]  In this position, plaintiff was responsible for "all technical and business leadership and overall management of the mechanical engineering department." (*Id.* at ¶ 5.)  Specifically, plaintiff's job duties included: supervising employees, directing employee projects, motivating employees to meet project deadlines, producing mechanical designs within budget and on schedule, and reviewing designs to ensure compliance with quality standards for professional engineers.  (*Id.* at ¶ 6.)  As Head of Mechanical Engineering, plaintiff reported to Farris Shaheen, who was Head of Mechanical, Electrical and Plumbing.  (*Id.* at ¶ 4.)

Undisputed evidence in the record shows that plaintiff's job performance began to decline in the Spring of 2002.  (Shaheen Aff. [71] at ¶ 4.)  Around May 2002, plaintiff began arriving to work several hours late almost every day.[3]  (*Id.*; Payne Aff. [71] at ¶ 8;

---

respond to the majority of defendant's statements.  (*See* Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74].)

[2] Plaintiff initially managed only the mechanical engineers who designed the heating, ventilation and air conditioning ("HVAC") systems for defendant's customers.  (DSMF [71] at ¶ 3.)  In January, 2002, defendant increased plaintiff's responsibilities, placing him in charge of the refrigeration and plumbing and fire protection groups, in addition to the HVAC group.  (*Id.* at ¶ 9.)

[3] Plaintiff claims that he had special permission to vary defendant's standard office hours of 8:00 to 5:00, so that he worked from 9:00 a.m. to 6:00 p.m.  (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 11.)  Assuming this is true, plaintiff fails to

AO 72A
(Rev.8/82)

Broome Aff. [71] at ¶ 5.)  Occasionally, he failed to report to work at all.  (Shaheen Aff. at ¶ 4; Broome Aff. at ¶ 5.)  As a result of his tardiness and absenteeism, plaintiff was not available to supervise and direct his staff.  (*Id.* at ¶ 5.) He was also frequently unavailable to review and stamp design drawings in a timely manner, causing defendant to miss project deadlines.  (*Id.;* Payne Aff. [71] at ¶ 10.)

Around the same time, plaintiff was involved in at least two incidents in which he lost his temper or otherwise communicated inappropriately with his employees and supervisor.  In March 2002, plaintiff became engaged in a heated discussion with two employees, Tammi Kinsey and Christopher Wheeler, concerning an impending deadline.  (Wheeler Aff. [71] at ¶¶ 5-15; Kinsey Aff. [71] at ¶¶ 4-12.)  Five employees who witnessed the incident testified that they were shocked by plaintiff's behavior, which included screaming, slamming his door, and stating, among other things, that he was not going to pull Kinsey's "frigging fat ass out of the fire again." (Thorn Aff. [71] at ¶¶ 3-10; Wheeler Aff. [71] at ¶¶ 3-15; Kinsey Aff. [71] at ¶¶ 3-15; Payne Aff. [71] at ¶¶ 3-10; Smith Aff. [71] at

---

rebut the evidence in the record that, beginning in May, 2002, plaintiff frequently arrived to work at 10:00 or 11:00, and occasionally did not show up to work at all.  (Payne Aff. [71] at ¶ 8; Shaheen Aff. [71] at ¶ 4; Broome Aff. [71] at ¶ 5.)

AO 72A
(Rev.8/82)

¶¶ 4-6.)[4]  Plaintiff admits that his reaction was inappropriate for a supervisor.  (Price Dep., Vol. II at 14.)

On another occasion, plaintiff became irate with his supervisor and another one of his employees, Mike Mahady, during a managers' meeting.  (Shaheen Aff. [71] at ¶¶ 11-14.)  At this meeting, plaintiff's supervisor, Shaheen, emphasized the need to complete project forecasts in a timely manner.  (*Id.* at ¶ 11.)  When plaintiff replied that he was unaware that any forecasts were past due, Shaheen mentioned that plaintiff had been sent e-mails regarding their due dates and suggested that plaintiff check his e-mail more frequently.  (*Id.*)  At this suggestion, plaintiff became angry and animated, screaming at his supervisor, and ultimately ordering Mahady to "get the fuck out of this meeting."  (*Id.* at ¶¶ 11-14; Mahady Dep. at 16.)[5]  As a result of plaintiff's behavior on these and other occasions, his employees began to avoid him.  (Wheeler Aff. [71] at ¶¶ 6-7; Kinsey Aff. [71] at ¶ 15; Duvall Aff. [71] at ¶¶ 8-9.)[6]

---

[4]  Plaintiff denies that he used profanity, but presents no evidence to contradict the five affidavits similarly recounting the incident.

[5]  Again, plaintiff denies using profanity, but fails to present any evidence to contradict the affidavits and deposition testimony submitted by defendant.  (*See* Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74].)

[6]  In addition, one of defendant's clients refused to work with plaintiff due to his unprofessional behavior.  (Dwyer Aff. [71] at ¶¶ 3-7.)

AO 72A
(Rev.8/82)

During the same time frame, defendant discovered that plaintiff was abusing company cell phone privileges[7] and violating company policy regarding expense reimbursement. (DSMF [71] at ¶¶ 20-29.) Defendant issued plaintiff a cell phone with a plan that allowed him 450 "anytime" minutes per month.  (*Id.* at ¶ 20.)  From April 16 to May 15, 2002, plaintiff used 2,736 minutes, resulting in charges of approximately $800.  (*Id.* at ¶ 21.)  The next month, plaintiff used 5,480 minutes, resulting in charges of approximately $1,760.[8]  (DSMF at ¶ 24; Grupe Aff. at ¶ 4.)  Defendant's Chief Engineer and plaintiff's indirect supervisor, Paul Grupe, reviewed plaintiff's cell phone bill and noticed that it was extreme.  (Grupe Aff. [74] at ¶ 3.)  In addition to the exorbitant amount of time plaintiff spent on the cell phone, Grupe noted that most of the numbers were not work-related.  (*Id.* at ¶ 4.)  When Grupe confronted plaintiff about the bill, plaintiff admitted that he was using the phone for personal

---

[7] Plaintiff denies misusing the company cell phone, but does not dispute any of the charges that appear on the cell phone bills, and does not deny using the cell phone for personal business.  (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 11-18.)  In fact, plaintiff does not dispute that he violated the company cell phone policy, but takes issue with the policy itself, claiming that it is "not reasonable for defendant to allow only 450 minutes."  (*Id.*) Obviously, it is not for the Court to determine whether defendant's cell phone policy was "reasonable."

[8] Plaintiff suggests that the cell phone bill is erroneous, but he does not dispute any specific item on either the May or June bill, which are attached to Defendant's Statement of Material Facts.  (DSMF [71] at Exs. 2 and 3.)

business. (*Id.* at ¶ 5; Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 12.) Grupe told plaintiff that he was concerned about his commitment to the company if he was spending so much of the work day on the phone conducting personal business.[9] (Grupe Aff. at ¶ 5.)

Regarding expense reimbursement, plaintiff submitted an expense report in August, 2002, seeking reimbursement for a number of in-town meals for himself and fellow employees, which were not reimbursable under defendant's policy.[10] (DSMF at Ex. 9.) Herbert Sprague, defendant's Controller, reviewed plaintiff's expense report and noted that it violated company policy. (Sprague Aff. [71] at ¶ 4.) Sprague notified plaintiff's supervisor of the violation. (DMSF at Ex. 9.)[11]

_____

[9] Defendant subsequently cancelled plaintiff's cell phone privileges. (DSMF at ¶ 26.)

[10] Defendant's Travel and Entertainment Policy and Procedures book provides that:

> In-town, Atlanta meals will not be approved when only employees are attendance. If these types of gatherings are important, then they must be authorized prior to the event by the Business Unit head and Vice President and Director of Travel Management. These should occur only on **rare** occasions.

(emphasis in original) (DSMF at Ex. 9.)

[11] Plaintiff again disputes that he violated company policy, but takes issue more with the policy itself than with the facts surrounding his violation of it. Plaintiff insists that in his opinion, "the expenditure of a business lunch" is a relatively

6

Eventually defendant's President, Nixon Cawood, and defendant's Chief Operating Officer, Ennis Parker, began to receive complaints about plaintiff's job performance.  (Parker Aff. [71] at ¶¶ 3-10; Cawood Aff. [71] at ¶ 4.)  Specifically, Parker received reports that:  plaintiff was consistently missing work or coming several hours late; plaintiff had lost his temper in dealing with some of his subordinates; plaintiff had accumulated cell phone charges dramatically in excess of what would be expected for a person in his position; and plaintiff had violated company policy with regard to expense reimbursement.  (Parker Aff. [71] at ¶¶ 3-10; Sprague Aff. at ¶ 4.)  Cawood received similar complaints about plaintiff's behavior, including late arrival, vocal outburst, using profanity, excessive cell phone use and expense account abuse.  (Cawood Aff. [71] at ¶ 4-6.)

Cawood and Parker met with plaintiff on July 8, 2002 to discuss his performance.[12]  (DSMF at ¶ 33.)  Plaintiff began the meeting in

---

inexpensive way to boost morale and assist in recruitment.  (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 39.)  Plaintiff is not authorized to substitute his business judgment for that of defendant, and neither is the Court.  Plaintiff's argument on this point does not contradict the evidence in the record establishing that he violated company policy concerning expense reimbursement.

[12]  Plaintiff contends that he called the meeting with Cawood and Parker to discuss his overdue incentive bonus payments.  (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 22.)  It is undisputed, however, that the focus of the meeting was plaintiff's conduct at work.  (Price Dep. Vol. I at 38, 58-72 and Vol. II at 26-28.)

an aggressive manner, deflecting any discussion of his workplace behavior and refusing to acknowledge any problems with his conduct. (Cawood Aff. at ¶ 8.)  After approximately an hour, Cawood and Parker interrupted plaintiff's presentation and asked him to explain his behavior.  (*Id.*)  At this point, plaintiff changed his demeanor and informed Cawood and Parker that he had been diagnosed with bipolar disorder.  (DSMF at ¶ 35.)  Cawood and Parker ended the meeting by offering to provide feedback on plaintiff's performance deficiencies and to have Shaheen monitor and advise plaintiff on work issues. (*Id.* at ¶ 36; Cawood Aff. [71] at ¶ 9.)

On August 15, 2002, Shaheen gave plaintiff his first performance review.  (DSMF at ¶ 44.)  Although plaintiff received an overall rating of "meets job requirements," he received a "needs improvement" rating in four categories, including:  Quantity of Work Produced, Adaptability, Cooperation, and Dependability.  (*Id.* at ¶ 45, Ex. 5.) Specifically, Shaheen noted in the review that plaintiff's "attendance and punctuality record is below guidelines" and that he has had problems "maintaining consistent working hours."  (DSMF at Ex. 5.)  In addition, Shaheen stated that plaintiff "incurs difficulties in establishing and maintaining good relationships" and that he exhibits "a lack of tact or consideration for others." (*Id.*) Finally, Shaheen indicated that plaintiff "too often misses deadlines" and "cannot be relied upon to meet his commitments."

AO 72A
(Rev.8/82)

(*Id.*)   Shaheen's review included a nine-point plan for improving plaintiff's job performance.  (*Id.*)

Although plaintiff's performance briefly improved following his review, within a month his work habits regressed to their previous level.  (Shaheen Aff. [71] at ¶ 14.)  At this time, plaintiff's attendance became sporadic again, and he became less responsive to requests from his employees and supervisors.  (*Id.*)  On October 15, 2002, Shaheen reminded plaintiff by e-mail that he needed to get to work on time.  (DSMF at Ex. 7.)  Plaintiff responded sarcastically: "Thanks.   I know that you do really care down deep."   (*Id.*) Plaintiff admits that his response was intended to be "tongue-in-cheek."  (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at  37.)

In November, 2002, Shaheen recommended to Parker and Cawood that plaintiff's employment be terminated.   (Shaheen Aff. at ¶ 17.) According to Shaheen, "no single incident . . . led to [his] recommendation."  (*Id.*)  Instead, the recommendation was based on "an accumulation of [plaintiff's] poor performance over the year and his failure to consistently meet performance standards."  (*Id.*)  Parker and Cawood concurred in the recommendation.  (Cawood Aff. at ¶ 10; Parker Aff. at ¶ 10.)  Consequently, defendant terminated plaintiff's employment on November 22, 2002.  (DSMF at Ex. 10.)  The separation notice indicates that plaintiff was terminated for "job performance." (*Id.*)

9

Plaintiff subsequently filed this lawsuit asserting claims under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq*, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. (Compl. [1] at ¶ 1.) Specifically, plaintiff contends that defendant discriminated against him on account of his bipolar disorder, in violation of the ADA. (*Id.* at ¶¶ 25-26.) In addition, plaintiff claims that defendant terminated him in order to avoid additional medical, disability, and pension costs, in violation of Section 510 of ERISA. (*Id.* at ¶ 33.) Defendant has filed a motion for summary judgment on plaintiff's ADA and ERISA claims.[13]

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."" FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue

---

[13]   Plaintiff was initially represented in this lawsuit by attorney John Crenshaw. (Compl. [1].) Mr. Crenshaw subsequently withdrew as plaintiff's counsel. (Intention to Withdraw as Counsel [22].) Plaintiff is now proceeding *pro se*.

10

is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324. While

11

the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986).

## II.   Plaintiff's ERISA Claim

Defendant contends that plaintiff failed to exhaust available administrative remedies, as required to assert a claim under ERISA. (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. [70] at 31.) Defendant also contends that plaintiff's ERISA claim fails on the merits, because plaintiff cannot establish a *prima facie* case of discrimination under Section 510 of the Act. (*Id.* at 34.) Plaintiff has failed to respond to defendant's arguments or otherwise address his ERISA claim. (*See generally*, Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74].)  Accordingly, the Court finds that plaintiff has abandoned his ERISA claim, and that defendant is entitled to summary judgment on this claim.  *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1114 (11th Cir. 1993) (holding that plaintiffs abandoned claim by failing to raise it in their brief); and *Hammond v. Gordon County,* 316 F.Supp. 2d 1262, 1280 (N.D. Ga. 2002) (Murphy, J.) (holding that

12

AO 72A
(Rev.8/82)

plaintiff abandoned claims by failing to respond to defendant's arguments on summary judgment).

### III. Plaintiff's ADA Claim

The ADA was designed to prohibit discrimination against disabled individuals. *D'Angelo v. ConAgra Foods, Inc.,* 422 F.3d 1220, 1227, (11th Cir. 2005).  The terms of the statute provide that :

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  Plaintiff contends that defendant discriminated against him because of his bipolar disorder when it gave him a negative performance review and terminated his employment. (Compl. [1] at ¶ 24.)

Plaintiff admits that there is no direct evidence of discrimination.  (Price Dep. Vol II at 69-70.)  Accordingly, the *McDonnell Douglas* burden shifting framework is applicable to this case.  *See Collado v. United Parcel Service Co.,* 419 F.3d 1143, 1149-1150 (11th Cir. 2005) (applying *McDonnell Douglas* framework to ADA case involving circumstantial evidence).  Under this framework, plaintiff initially has the burden of establishing a *prima facie* case of disability discrimination.  *Cleveland v. Home Shopping*

AO 72A
(Rev.8/82)

*Network, Inc.,* 369 F.3d 1189, 1193 (11th Cir. 2004) (citing *Wascura v. City of South Miami,* 257 F.3d 1238, 1242 (11th Cir. 2001)).  Once plaintiff establishes a *prima facie* case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for his negative review and termination.  *Id.*  If defendant meets this burden, plaintiff must produce some evidence that defendant's articulated reason is "unworthy of credence," and a pretext for discrimination, in order to survive summary judgment.  *Id.*

## A.    Plaintiff's Prima Facie Case

To establish a *prima facie* case of discrimination under the ADA, plaintiff must show that:  1) he has a disability; 2) he is "qualified" for his position; and 3) defendant discriminated against him because of his disability.  *Caruthers v. BSA Advertising, Inc.,* 357 F.3d 1213, 1215 (11th Cir. 2004).  Defendant contends that plaintiff cannot establish a *prima facie* case, because he is neither "disabled" nor "qualified," as those terms are defined under the ADA.  (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. [70] at 2.)  The Court agrees.

### 1)    Plaintiff is not "disabled."

Under the ADA, an individual is "disabled" if he:

> A) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> B) [has] a record of such impairment; or

14

C) [is] regarded as having such an impairment.

42 U.S.C. § 12102(2).  Plaintiff contends that he is disabled as a result of his bipolar disorder.  (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 2.)  Specifically, plaintiff argues that his disorder is a "mental impairment" that substantially limits one or more of his major life activities, qualifying him as disabled under § 12102(2)(A).  (Id.)  In the alternative, plaintiff argues that defendant "regarded [him] as" disabled under § 12102(2)(C).  After a careful review of all the evidence in the record, the Court concludes that plaintiff cannot establish that he is "disabled" under definition (A) or "regarded as" disabled under definition (C).[14]

a) Plaintiff is not "disabled" under § 12102(2)(A).

Bipolar disorder has been held to constitute a mental impairment.  See Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1132 (11th Cir. 1996) (recognizing that depression constitutes a mental impairment).  See also, Glowacki v. Buffalo General Hosp., 2 F.Supp.2d 346, 351 (W.D.N.Y. 1998) (noting that bipolar disorder has been recognized as an impairment under the ADA).  Merely having an impairment, however, does not render an individual "disabled" under § 12102(2)(A).  See Collado, 419 F.3d at 1155 (emphasizing that

---

[14]   Plaintiff does not argue that he has a "record of" a substantially limiting impairment under § 12102(2)(B).

impairment must substantially limit a major life activity to rise to the level of a disability under § 12102(2)(A)). Plaintiff must also show that his bipolar disorder substantially limits one or more of his major life activities. *Id.* That determination does not follow automatically from plaintiff's diagnosis of bipolar disorder; instead, it must be made "on a case-by-case basis." *Id.*

In response to defendant's Motion for Summary Judgment, plaintiff contends that his bipolar disorder substantially limits the major life activities of: 1) interacting with others; and 2) working. Regarding his first contention, plaintiff cites no authority for the proposition that "interacting with others" constitutes a major life activity. The ADA regulations define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The Eleventh Circuit has not determined whether "interacting with others" fits within this definition. At least one Circuit Court has expressed doubt on this point. *See Rohan v. Networks Presentations LLC,* 375 F.3d 266, 274 (4th Cir. 2004). *See also, Doebele v. Sprint Corp.,* 168 F.Supp.2d 1247, 1261–62 (D. Kan. 2001)(noting that 10th Circuit has not held "interacting with others" to be a major life activity).

The Court declines to resolve this issue in this case because, assuming that "interacting with others" is a major life activity,

16

plaintiff has not demonstrated that it is an activity in which he is substantially limited.  The only evidence plaintiff cites in support of his claim is his August, 2002 performance review and defendant's initial disclosures.  (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 3.)  Plaintiff's performance review documents certain aspects of plaintiff's job performance that need improvement, including that:  plaintiff is "often late to work;" his "group problem solving needs improvement;" he uses "inappropriate methods of communication and is slow in asking for help;" and he "cannot be relied upon to meet his commitments."  (Id. at 3-4.)  Defendant's disclosures provide further information concerning plaintiff's behavior at work, including the fact that an "abuse complaint [concerning plaintiff] was filed with human resources," and that his cell phone usage was "outrageous."  (Id.)

The Court fails to see the connection between many of the items cited by plaintiff and his asserted "inability to interact with others."  Plaintiff's outrageous cell phone usage, for example, does not support his claim that he was unable "to interact with others." Plaintiff's attendance and punctuality problems, and his inability to meet work commitments, are similarly irrelevant.  Moreover, while some of the statements in the review and disclosures suggest that plaintiff had some difficulty interacting with other employees, none of those statements permits an inference that plaintiff was

17

"substantially limited" in this activity. Under the ADA, "substantially limited" means "unable to perform" or "significantly restricted as to the condition, manner, or duration" of performance in comparison with the average person in the general population. *See* 29 C.F.R. §§ 1630.2(j)(1)(i),(ii). Factors that may be relevant to the inquiry include: 1) the nature and severity of plaintiff's impairment; 2) the duration or expected duration of the impairment; and 3) the permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

Unfortunately, plaintiff has not produced any evidence addressing these factors, or addressing more generally the extent to which his bipolar disorder restricts the "condition, manner, or duration" of his interactions with others. Plaintiff's own testimony suggests that medication controls most of the symptoms of his bipolar disorder, including any symptoms that might affect his ability to interact with others. (Price Dep. Vol. I at 108-113, 115-118.) *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 488 (1999) (holding that "disability is to be determined with reference to corrective measures"). Other evidence in the record, including the review and disclosures, indicates that plaintiff is not "unable" to interact with others; he just occasionally does so in an inappropriate manner. There is no evidence in the record to suggest

18

that plaintiff's general ability to interact with others is "significantly restricted in comparison with the average person in the general population."  *See Chanda v. Engelhard/ICC,* 234 F.3d 1219, 1222 (11th Cir. 2000) (concluding that plaintiff's tendinitis, while limiting, did not impose the statutorily required substantial limitation on his ability to perform manual tasks); and *Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1228 (11th Cir. 1999) (holding that diminished tolerance for normal daily activities did not constitute a substantial limitation as required by the ADA).

Plaintiff's claim that he is substantially limited in the major life activity of working is similarly flawed.  In support of this claim, plaintiff asserts in a conclusory manner his "inability to work during the depression component of the bipolar disorder  . . . per Dr. Haley." (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 2.)[15]  Plaintiff has not presented any testimony of Dr. Haley, either by declaration or deposition, to substantiate his claim.  To

---

[15]  Plaintiff also asserts that the "depression component will become more severe and last longer with age per Dr. Scarbrough." (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 2.)  As with Dr. Haley, plaintiff does not present any testimony of Dr. Scarbrough that the Court could rely upon to evaluate the effects of the depression component of plaintiff's bipolar disorder.  In addition, the future effects of plaintiff's disorder are irrelevant to the issue that is now before the Court:  whether defendant discriminated against plaintiff due to his disability when it terminated him in November, 2002.

19

rely on Dr. Haley's assessment of the effects of his bipolar disorder, plaintiff must produce "competent evidence" of Dr. Haley's opinion, which he has not done. *Celotex Corp.,* 477 U.S. at 324.

Other evidence in the record, including the review and disclosures discussed above, indicates, at most, that plaintiff was unable to effectively perform his job as Senior Manager, Head of Mechanical Engineering. The Eleventh Circuit has repeatedly held that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Rossbach v. City of Miami,* 371 F.3d 1354, 1359 (11th Cir. 2004); *Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366, 1369-70 (11th Cir. 1998). Instead, in order to establish that he is substantially limited in his ability to work, plaintiff must show that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." *Rossbach,* 371 F.3d at 1359(holding that "police officer" is too narrow a range of jobs to constitute a "class of jobs" under the ADA); *Witter,* 138 F.3d at 1369-70 (holding that piloting airplanes is too narrow a range of jobs to constitute a "class of jobs" under the ADA). There is no evidence in the record to suggest that plaintiff is unable to perform a "class of jobs" or a "broad range of jobs in various classes."

Plaintiff's unsubstantiated claim that he is "unable to work

20

during the depression component" of his bipolar disorder falls far short of the showing required to establish a substantial limitation in the major life activity of working. Plaintiff's claim that he is substantially limited in his ability to "interact with others" is also without support in the record. Accordingly, plaintiff has not created a genuine issue of fact concerning whether he is "disabled" under 42 U.S.C. § 12102(2)(A).

      b)   Plaintiff was not "regarded as" disabled under § 12102(2)(B).

Plaintiff's argument that defendant "regarded" him as disabled is also unpersuasive. (See Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 4-5.) An individual is "regarded as" disabled if he:

> 1)   [h]as a physical or mental impairment that does not substantially limit major life activities but is treated by [his employer] as constituting such limitation; [or]

> 2)   [h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment.

29 C.F.R. § 1630.2(l).[16] Plaintiff claims that defendant regarded his bipolar disorder as an impairment that substantially limited his ability to: 1) interact with others; and 2) work.

---

[16] An individual may also be regarded as disabled if he has no impairment, "but is treated by [his employer] as having a substantially limiting impairment." 29 C.F.R. § 1630.2(l)(3). This provision does not apply in this case, where both parties agree that plaintiff's bipolar disorder constitutes an impairment.

21

In support of his claim that defendant regarded him as substantially limited in his ability to "interact with others," plaintiff again cites his performance review. It is apparent from the review that defendant found plaintiff to be uncooperative, difficult to work with, and occasionally inappropriate. (DSMF at Ex. 5.) "As with actual disabilities," however, "a perceived impairment must be believed to substantially limit a major life activity of the individual." *Hilburn,* 181 F.3d at 1230. Plaintiff's review does not, in and of itself, permit an inference that defendant regarded plaintiff as "unable" to interact with others, or "significantly restricted as compared to the average person" in his ability to interact with others. *See Watson v. City of Miami Beach,* 177 F.3d 932, 935 (11th Cir. 1999) (evidence that other officers regarded plaintiff as "paranoid," "disgruntled," "oppositional," "difficult to interact with," and "unusual," insufficient to raise a question of fact concerning whether plaintiff was regarded as disabled).

Plaintiff also cites the review in support of his claim that defendant regarded him as substantially limited in his ability to work. (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 4-5.) In addition, plaintiff cites his separation notice indicating that he was terminated for "job performance." (*Id.* at 5.) As noted, plaintiff's review suggests that defendant regarded him as lacking

22

some of the skills required to effectively perform his job as Senior Manager, Head of Mechanical Engineering. (DSMF at Ex. 5.) "Being regarded as unable to perform only a particular job," however, "is insufficient, as a matter of law, to prove that [plaintiff] is regarded as substantially limited in the major life activity of working." *Collado,* 419 F.3d at 1157 (internal cites and quotation marks omitted). Plaintiff's performance review does not permit an inference that defendant regarded him as unable to perform a "class of jobs" or a "broad range of jobs within various classes," as required by the ADA. *See id.* (discussing the legal standard applicable to plaintiff's claim that he was "regarded as" substantially limited in his ability to work).

Thus, plaintiff's claim that defendant regarded him as disabled, like his claim that he is actually disabled, is unsubstantiated by any evidence in the record. *See Hilburn,* 181 F.3d at 1228 ("Conclusory allegations without specific supporting facts have no probative value."). As plaintiff has not presented sufficient evidence to raise a question of fact concerning whether he is "disabled," as required to establish his *prima facie* case, defendant is entitled to summary judgment on plaintiff's ADA claim.

### 2)   Plaintiff is not a "qualified individual."

In addition, plaintiff cannot show that he is a "qualified individual," as required by the ADA. "To be a 'qualified

individual' under the ADA, a person must be able to perform the essential functions of his or her job with or without a reasonable accommodation."[17]   *Wood v. Green,* 323 F.3d 1309, 1312 (11th Cir. 2003) (citing *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001)).   "'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform."   *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1365 (11th Cir. 2000).   In determining what functions are deemed essential, "consideration [is] given to the employer's judgment," including that judgment as expressed in a "written job description."[18]   *Id.*

---

[17]   Plaintiff does not argue that he was entitled to an accommodation, and has not identified any "reasonable accommodation" that would have enabled him to perform the essential functions of his job.   Accordingly, the Court does not consider whether plaintiff could perform his job with an accommodation.   *See Willis v. Conopco, Inc.,* 108 F.3d 282, 286 (11th Cir. 1997) (stating that "establishing that a reasonable accommodation exists is part of an ADA plaintiff's case").   *See also, Terrell v. USAIR,* 132 F.3d 621, 624 (11th Cir. 1998) ("[T]he burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual.") (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1286 (11th Cir. 1997)).

[18]   The ADA regulations also identify three factors that may be relevant to the question whether a particular job task is "an essential function": 1) the reason the position exists is to perform the function; 2) there are a limited number of employees available among whom the performance of the job function can be distributed; and 3) the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to perform the particular function.   *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1526 (11th Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(2)(i)-

AO 72A
(Rev.8/82)

Plaintiff's job title was Senior Manager, Head of Mechanical Engineering. (DSMF at ¶ 2.) In this position, plaintiff was responsible for "all technical and business leadership and overall management of the mechanical engineering department." (*Id.* at Ex. 1.) Plaintiff's specific job duties included: supervising employees, directing employee projects, answering technical questions, motivating employees to meet project deadlines, producing mechanical designs within budget and on schedule, and reviewing designs to ensure consistency with quality standards for professional engineers. (*Id.*) All of these duties appear in the written job description for the Senior Manager, Head of Mechanical Engineering position, and plaintiff does not dispute that each is "essential." (DSMF at Ex. 1; Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 5-7.)

Undisputed evidence in the record establishes that plaintiff was not able to perform many of these functions when he was terminated in November 2002. In May 2002, plaintiff began arriving to work several hours late almost every day. (Shaheen Aff. [71] at ¶ 4; Payne Aff. [71] at ¶ 8; Broome Aff. [71] at ¶ 5.) Occasionally, he failed to report to work at all. (Shaheen Aff. at

---

(iii)(1996)(concluding that collection of all evidence at crime scene is an essential function of being a police detective).

25

¶ 4; Broome Aff. [71] at ¶ 5.)   According to the unrebutted testimony of several employees, plaintiff's absence from work interfered with his ability to supervise employees, direct employee projects, review designs, and meet deadlines.   Specifically, plaintiff's failure to maintain consistent working hours:   caused scheduling and deadline problems in over 50% of the projects that plaintiff directed; resulted in plaintiff's failure to check 25-30% of the projects that he was responsible for reviewing; and caused plaintiff's employees to lose confidence in him.   (See Mahady Dep. at 12, 23; Wheeler Aff. [71] at ¶ 4; Payne Aff. [71] at ¶¶ 8-12; Kinsey Aff. [71] at ¶¶ 7-9.)[19]

Plaintiff's tardiness and absenteeism also interfered more generally with his ability to provide leadership in his department. (Shaheen Aff. [71] at ¶ 5.)   Plaintiff's employees noticed his inconsistent attendance and began commenting upon his work habits in a derogatory manner.[20]   (Payne Aff. [71] at ¶ 8.)   Thus, plaintiff's attendance and punctuality problems rendered him unable to perform

---

[19]   Plaintiff has not presented any evidence to dispute the affidavits and deposition testimony detailing plaintiff's poor attendance and its effect on the employees he supervised and the projects he directed.   (See generally, Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74].)

[20]   For example, plaintiff used his middle name, "Hal," at work. Employees referred to plaintiff's work schedule as being on "Hal time."   (Payne Aff. at ¶ 8.)

AO 72A
(Rev.8/82)

the most basic function of his job, providing "business leadership" to the mechanical engineering department.   (DSMF at Ex. 1.)   *See Paleologos v. Rehab Consultants, Inc.,* 990 F.Supp. 1460, 1467 (N.D. Ga. 1998) (Carnes, J.) (holding that plaintiff's "inability to attend work on a regular basis" rendered her unqualified for position that required supervising other employees).   *See also, Earl,* 207 F.3d at 1365 (holding that punctuality was an essential function of plaintiff's job as Store Area Coordinator); and *Lewis v. Zilog,* 908 F.Supp. 931, 947 (N.D. Ga. 1995) (Hull, J.) (concluding that plaintiff with bipolar disorder was not a "qualified individual with a disability" because she could not maintain a regular level of attendance at her job).

In addition, the undisputed evidence in the record establishes that plaintiff was involved in at least two incidents in which he lost his temper and behaved inappropriately at work, further diminishing his ability to supervise employees and provide effective leadership.   In March 2002, plaintiff became engaged in a heated discussion with two employees, Tammi Kinsey and Christopher Wheeler, concerning an impending deadline.   (Wheeler Aff. [71] at ¶¶ 5-15; Kinsey Aff. [71] at ¶¶ 4-12.)   Five employees who witnessed the incident were shocked by plaintiff's behavior, which included screaming, slamming his door, and stating, among other things, that he was not going to pull Kinsey's "frigging fat ass out of the fire

27

again."   (Thorn Aff. [71] at ¶¶ 3-10; Wheeler Aff. [71] at ¶¶ 3-15; Kinsey Aff. [71] at ¶¶ 3-15; Payne Aff. [71] at ¶¶ 3-10; Smith Aff. [71] at ¶¶ 4-6.)   On another occasion, plaintiff became irate with his supervisor and one of his employees, Mike Mahady, during a managers' meeting. (Shaheen Aff. [71] at ¶¶ 11-14.)   Employees who observed plaintiff's outburst at the meeting felt that his behavior was inappropriate. (Smith Aff. [71] at ¶¶ 7-8; Shaheen Aff. [71] at ¶¶ 11-14; Mahady Dep. at 16.)

As a result of plaintiff's behavior, his employees lost confidence in him and began to avoid him. (Wheeler Aff. [71] at ¶¶ 6-7; Kinsey Aff. [71] at ¶ 15; Duvall Aff. [71] at ¶¶ 8-9.) Consequently, and for this additional reason, plaintiff was unable to effectively supervise employees, and provide "business leadership" to his department. (*See* DSMF at Ex. 1.)  *See Hardy v. Sears, Roebuck & Co.,* 1996 WL 735565 *6 (N.D.Ga. 1996) (Murphy, J.) (noting that "abusive and threatening behavior by an employee . . . may dictate that [the] employee cannot perform the essential functions of a given job"); and *Ray v. Kroger Co.,* 264 F.Supp.2d 1221, 1228 (S.D. Ga. 2003) (finding that employee with Tourette's Syndrome was not qualified for job as utility clerk as a result of his inability to perform his duties without blurting out offensive words in front of customers).

Despite all of the evidence in the record concerning

28

plaintiff's attendance problems and inappropriate behavior, he argues that he was qualified to perform the functions of his job because:  1) he was awarded a supplemental retirement benefit on March 27, 2002, in recognition of his level of responsibility; and 2) he was promoted to Mechanical Department Manager in January 2002, after six months as "HVAC" Department Manager.  (Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 5-6.)  Assuming these facts are true, they have no relevance to plaintiff's ability to perform the essential functions of his position when he was terminated in late November, 2002.  The undisputed evidence in the record establishes that plaintiff's attendance and punctuality became a serious problem in May, 2002, and continued to be a problem until his termination on November 22nd.  During the same time frame, plaintiff began to lose his temper and exhibit other inappropriate behaviors at work.  That plaintiff was promoted in January, or awarded a bonus in March, is simply insufficient to permit a reasonable jury to conclude that plaintiff was able to perform the essential functions of his job the following November, when all other evidence in the record is to the contrary.

Plaintiff also cites his August, 2002 performance review as evidence that he was "qualified."  (See Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. [74] at 6.)  Plaintiff does not elaborate on his argument, which the Court assumes to be that he was qualified

29

because he received an overall rating of "meets job requirements." (DSMF at Ex. 5.) In addition to stating plaintiff's overall rating, however, the review outlines four areas in which plaintiff "needs improvement," including: 1) quantity of work produced; 2) adaptability; 3) cooperation; and 4) dependability. (DSMF at Ex. 5.) The narrative in the review identifies numerous problems with plaintiff's work performance, including that plaintiff: 1) too often misses deadlines; 2) responds poorly to criticism or feedback; 3) incurs difficulties in establishing and maintaining good relationships; and 4) has a poor attendance and punctuality record. (*Id.*) The Court cannot substitute its own judgment for that of the employer, and conclude that plaintiff's overall rating of "meets job requirements" overrides his identified deficiencies, and establishes that plaintiff is qualified for his job, in spite of all of the evidence in the record to the contrary. *See Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that federal courts do not sit as "a super-personnel department" to reexamine employers' business decisions).

Essentially, plaintiff's claim that he is "qualified" suffers from the same problem as his claim that he is disabled: a lack of any substantiating evidence beyond plaintiff's own unsupported allegations. Plaintiff offers no evidence to contradict the numerous affidavits and documents in the record establishing that

plaintiff was not able-or not willing-to perform the essential functions of his position when he was terminated in November 2002. As plaintiff has not presented sufficient evidence to raise an issue of fact concerning whether he is "qualified," as required to establish his *prima facie* case, defendant is entitled to summary judgment on plaintiff's ADA claim.

**B.    Defendant's Legitimate, Nondiscriminatory Reasons for Terminating Plaintiff**

Even if plaintiff were able to establish a *prima facie* case, defendant would still be entitled to summary judgment. As noted, the *McDonnell Douglas* burden-shifting framework applies to this case. *See Collado,* 419 F.3d at 1149-1150. Under this framework, plaintiff initially has the burden of establishing a *prima facie* case of disability discrimination. *Cleveland,* 369 F.3d at 1193. Once plaintiff establishes a *prima facie* case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for his termination. *Id.* If defendant meets this burden, plaintiff must produce some evidence that defendant's articulated reason for his termination is "unworthy of credence," and a pretext for discrimination, in order to survive summary judgment. *Id.*

Defendant has proffered at least three legitimate non-discriminatory reasons for terminating plaintiff's employment: 1) plaintiff's attendance and punctuality problems; 2) plaintiff's

31

inappropriate behavior at work, including losing his temper with his employees and supervisor and engaging in conduct not befitting a senior manager on at least two occasions; and 3) plaintiff's abuse of company cell phone privileges and violation of company policies relating to expense reimbursement. (DSMF at ¶¶ 16-31, 47-49, 55-61.) Each of these legitimate, non-discriminatory reasons for plaintiff's termination is well-supported by testimony and documentary evidence in the record, including the affidavits of 15 of defendant's employees, copies of plaintiff's cell phone bills and improper expense reports, and plaintiff's August, 2002 performance review.[21] (DSMF at Exs. 2-7, 9-10, and attached affidavits at Exs. A-O.)

Under the *McDonnell-Douglas* burden shifting framework, once the defendant proffers sufficiently probative, credible, non-discriminatory reasons for its actions, as it has in the instant case, plaintiff must come forward with specific evidence tending to show that such reasons were a pretext for discrimination. *See Willis v. Conopco, Inc.,* 108 F.3d 282, 287 (11th Cir. 1997) (finding

---

[21] Even if some of plaintiff's inappropriate behavior at work was related to his bipolar disorder, it is well-settled that "the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability." *Ray,* 264 F.Supp.2d at 1228 (holding that even though plaintiff's constant blurting out of vulgar language was caused by his Tourette's Syndrome, defendant had a legitimate basis for terminating his employment).

32

summary judgment proper where ADA plaintiff failed to offer evidence to raise an inference that defendant's articulated explanation for her termination was pretext for discrimination); and *Lewis,* 908 F.Supp. at 952 (concluding that plaintiff was not entitled to relief under the ADA where she failed to present evidence that defendant's legitimate, non-discriminatory reasons for her termination were pretextual). Plaintiff has not met this burden. He has failed even to state that the reasons cited by defendant were pretextual, much less cite evidence and facts that could discredit them. As a result, and for this additional reason, defendant is entitled to summary judgment on plaintiff's claim of disability discrimination under the ADA.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant's Motion for Summary Judgment [69].

SO ORDERED, this 30 day of November, 2005.



JULIE E. CARNES
UNITED STATES DISTRICT JUDGE